## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JASON MCMANUS HOLTZMAN, *et al.*,

            *Plaintiffs*,

    v.

KUNSTMUSEEN KREFELD,

            *Defendant*.

Civil Action No. 20 - 2976

## <u>MEMORANDUM OPINION</u>

Plaintiffs Jason, Jackie, and Madalena McManus Holtzman, as Trustees of the Elizabeth McManus Holtzman Irrevocable Trust (the "Trustees"), allege that Defendant Kunstmuseen Krefeld (the "Kunstmuseen"), a collection of art museums owned and operated by the City of Krefeld, Germany, wrongfully expropriated eight paintings from the Trust. The Kunstmuseen has moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1611. ECF No. 15. The Trustees have moved for leave to file a surreply in response to the motion. ECF No. 24. For the reasons explained below, the court will grant the Trustees' motion for leave to file a surreply and grant the Kunstmuseen's motion to dismiss.

## I.      FACTUAL BACKGROUND

The Trustees seek recovery of four paintings (the "Mondrian Four") by Dutch artist Piet Mondrian, which they allege were wrongfully expropriated by the Kunstmuseen, and compensation for four additional Mondrian paintings (the "Additional Mondrians"), which they

allege the Kunstmuseen sold or exchanged.[1]  The court draws the following facts, which it accepts as true, from the Trustees' complaint and the parties' briefing.  *Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011); *see Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction . . . .").

### A.    Piet Mondrian and the Paintings

Piet Mondrian, "a leading innovator of abstract art," created the paintings in the 1920s.  ECF No. 1 ¶ 2.  In 1925, he consigned five of the eight paintings to a prominent art dealer.  *Id.* ¶ 29.  The next year, he consigned another to a gallery in Dresden, Germany.  *Id.* ¶¶ 30-31.  The art dealer then entrusted the consignment of the five paintings in his control to the gallery in Dresden.  *Id.* ¶ 30.  The Trustees allege that the remaining two paintings were also consigned to the gallery or consigned to the dealer and then entrusted to the gallery.  *Id.* ¶ 32.  In 1929, all eight paintings—the Mondrian Four and the Additional Mondrians—were sent to the Kunstmuseen for an exhibition.  *Id.* ¶ 36.  That exhibition never came to fruition, and the paintings "remained in the possession, custody, or control" of the Kunstmuseen.  *Id.* ¶¶ 37-38.  It appears that Mr. Mondrian never asked for the paintings to be returned to him, and the Kunstmuseen never contacted Mr. Mondrian or his representatives to arrange for their return.  *Id.* ¶ 38.

---

[1] The Mondrian Four include Tableau no. VII (1925), Tableau no. X (1925), Tableau no. XI (1922), and Komposition IV (1926).  ECF No. 1 ¶ 27.  The Additional Mondrians include Composition III (1920), Tableau no. VIII (1925), "Additional Mondrian 3," and "Additional Mondrian 4."  *Id.* ¶ 28.

By 1937, the Nazis had consolidated control of Germany. *Id.* ¶ 45. One Nazi leader spearheaded a campaign to label modern art and artists as "[d]egenerate" and to purge "[d]egenerate" art. *Id.* That year, the Nazis held a "[d]egenerate" art exhibition with hundreds of works from German public museum collections, including two other Mondrian paintings. *Id.* ¶ 46. Because the Mondrian Four and the Additional Mondrians were not listed in the Kunstmuseen's inventory at the time, they were not featured in the exhibition. *Id.* "[N]one of the [Kunstmuseen's] directors during the Nazi regime was aware of the existence or location of the Paintings." *Id.* ¶ 44. The paintings thus "escaped Nazi hands." *Id.* ¶ 46.

In 1938, Mr. Mondrian, fearing persecution by the Nazi regime, fled his home in Paris to London, and then, two years later, fled London for New York. *Id.* ¶ 6. Harry Holtzman, an abstract painter based in New York and one of Mr. Mondrian's closest friends, sponsored his immigration to the United States in 1940. *Id.* ¶ 52. Mr. Mondrian assumed, "in light of his status as a persecuted person, the Nazi occupation, and the ongoing War," that "his artworks left in Germany could not be retrieved, were lost and likely doomed." *Id.* ¶ 51. In February 1944, Mr. Mondrian, while living in New York City, died unexpectedly of pneumonia. *Id.* ¶ 53. In his will, he bequeathed all his works and property to Mr. Holtzman. *Id.* At the time of Mr. Mondrian's death, Mr. Holtzman was unaware of the existence of the Mondrian Four and the Additional Mondrians. *Id.* ¶¶ 53-54. Mr. Holtzman's estate was later placed into a trust for his three children, who are the Trustees here. *Id.* ¶¶ 66-67.

After World War II, the paintings resurfaced at the Kunstmuseen. Paul Wember, then-director of the Kunstmuseen, discovered the Mondrian Four and the Additional Mondrians "under 'mysterious circumstances'" in 1950. *Id.* ¶¶ 58-59. The Trustees allege that Director Wember knew that the paintings were Mr. Mondrian's property but failed to notify his

heirs, successors, agents, or the British Military government in power in Germany at the time, or to otherwise attempt to return the paintings to the Mondrian estate.  *Id.* ¶ 60.  Between 1951 and 1953, Director Wember either sold the Additional Mondrians to purchase other pieces of art or exchanged them for other pieces of art.  *Id.* ¶¶ 61-62.  In 1954, the Kunstmuseen's internal directory listed the Mondrian Four for the first time.  *Id.* ¶ 63.  The catalog entries for the Mondrian Four lacked information about how they had been acquired, whereas other entries included a notation of "purchase" or "gift."  *Id.* ¶ 64.

In 2011, the Trustees learned that the Mondrian Four were located at the Kunstmuseen and that the provenance of the paintings was unclear.  *Id.* ¶ 68.  They retained German counsel to assist them in their investigation.  *Id.* ¶ 69.  The German counsel wrote several letters to the then-Lord Mayor of Krefeld, inquiring about the provenance of the Mondrian Four.  *Id.*  At the same time, two German researchers were independently investigating the provenance of another set of Mondrian paintings that had been lost during the Nazi era.  *Id.* ¶ 72.  They approached the Trustees and offered to help with their investigation.  *Id.*  Years later, the researchers concluded that the Kunstmuseen had never lawfully acquired ownership of the Mondrian Four or the Additional Mondrians and that the Trustees are the successors in interest to both sets of paintings.  *Id.* ¶ 73. The Trustees provided this expert opinion to the Lord Mayor of Krefeld, who stated in 2017 that there would be a thorough investigation into the matter.  *Id.* ¶¶ 73-74.  Thereafter, the Trustees demanded the return of the Mondrian Four, but the Lord Mayor's counsel declined.  *Id*. ¶ 77.  In 2019, the City of Krefeld's counsel advised the Trustees that a "final" decision had been made rejecting their claim to the paintings.  *Id.* ¶ 78.

**B.      The Kunstmuseen**

The Kunstmuseen is a collection of three museums—the Wilhem-Museum, the Museum Haus Lange, and the Museum Haus Esters.  *Id.* ¶ 1; ECF No. 15-9, at 2.  Under the Kunstmuseen's June 13, 1991 charter (the "Charter"), the Kunstmuseen is deemed "an institution of the City of Krefeld," and the Mayor "administer[s] and represent[s]" it.  ECF No. 15-9, at 2; ECF No. 15-7, at 6 ¶ 13.[2]  The Mayor's office issues a "task classification plan" that assigns the Kunstmuseen's functions.  ECF No. 15-7, at 4 ¶ 9; ECF No. 15-10, at 6.  These functions include "[c]onducting of museum operations;" "classification, appraisal and acquisition of museum objects;" "inventory maintenance;" "putting on events;" "[p]resentation of the collections;" "[c]ooperation with institutions and groups of cultural, scientific, social and educational life;" and operating a museum library.  ECF No. 15-10, at 6.

State and local law provide the Kunstmuseen's "purpose," which is centered on "the promotion and preservation of cultural values, the promotion of education, popular and professional training, as well as the promotion of science and research."  ECF No. 15-9, at 2.  The Kunstmuseen has no role in foreign relations or diplomacy.  ECF No. 19-1, at 4 ¶ 10.  Additionally, the Constitution of North Rhine-Westphalia requires municipalities to assume responsibility for promoting and maintaining culture in their respective territories.  ECF No. 15-2, at 8 (citing ECF No. 15-7, at 9 ¶ 22).  And a state statute, the *Kulturgesetzbuch* ("Culture Code"), outlines the joint responsibility of North Rhine-Westphalia and its municipalities to promote art and culture.  ECF

---

[2] When citing ECF Nos. 15-4, 15-7, 15-8, 15-9, 15-10, 15-13, 15-14, 19-1, 19-3, and 19-6, the court uses the page numbers generated by CM/ECF, rather than each document's internal pagination.

No. 15-14, at 3 § 1 (copy of the Culture Code); ECF No. 15-7, at 9 ¶ 22.  The Culture Code allows both public and private entities to fulfill its mission.  ECF No. 19-1, at 6 ¶ 14.

The City of Krefeld is divided into divisions, each of which are composed of departments or institutes.  ECF No. 15-7, at 3 ¶ 7; ECF No. 15-8, at 2 (City of Krefeld organizational chart).  The City's museums are part of the Department of Culture, which has its own director who ultimately reports to the Lord Mayor of Krefeld.  ECF No. 15-8, at 2.  The Kunstmuseen does not manage its own budget.  ECF No. 15-7, at 6 ¶ 14.  Instead, the City of Krefeld allocates a financial budget for its museums, which in 2020 comprised about 85% of the Kunstmuseen's expenses (with the rest coming from the Kunstmuseen's income).  *Id.* at 6-7 ¶ 15.  The Kunstmuseen's assets are owned by the City of Krefeld.  *Id.* at 8 ¶ 18.  The Mondrian Four are listed on the City of Krefeld's asset list and each painting has an estimated value of 3 million euros.  *Id.*; ECF No. 15-13, at 6-10.

Under German law, the Kunstmuseen has neither independent legal capacity, which is the ability to bear rights and obligations, nor transactional capacity, which is the ability to undertake legal transactions.  ECF No. 15-7, at 6 ¶ 11.  It accordingly lacks the capacity to become a party to a German civil suit or administrative proceeding.  *Id.* at 8 ¶ 19.  Finally, German law bars the enforcement of judgment against the Kunstmuseen.  *Id.* at 8 ¶ 20.  As with roughly half of museums in Germany, the Kunstmuseen is publicly owned.  *Id.* at 6 ¶ 12; ECF No. 19-1, at 7 ¶ 16.

The Kunstmuseen is connected to the United States in a few ways.  First, it employs a public relations firm, "e-flux," in New York to distribute news in English about exhibitions and events to U.S. citizens.  ECF No. 19, at 4-5 (citing *Kunstmuseen Krefeld*, e-flux[3]).  It also sells books and publications in the United States through American distributors.  *Id.*; ECF No. 1 ¶ 23.

---

[3] *Available at* https://perma.cc/8RL6-BLVA.

Separately, the Kunstmuseen distributes its books and publications to several District of Columbia public institutions, including the Library of Congress, National Gallery of Art Library, Smithsonian Libraries, and National Museum of Women in the Arts.  ECF No. 1 ¶ 24.

### C.    Procedural History

In October 2020, the Trustees commenced this suit seeking recovery of the Mondrian Four and compensation for the sale or exchange of the Additional Mondrians.  *Id.* ¶ 1.  In their complaint, the Trustees allege claims of bailment, replevin, conversion, constructive trust, and unjust enrichment.  *Id.* ¶¶ 88-149.

The Trustees first attempted to serve the Kunstmuseen pursuant to Article 5 of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Feb. 10, 1969, 20 U.S.T. 361, T.I.A.S. No. 6638, which provides for service through the Central Authorities of the receiving country.  *See* ECF No. 10, at 3.  In April 2021, the Trustees received a letter from the President of the Düsseldorf High Regional Court rejecting their request for service.  ECF No. 10, at 3.  The President's stated reason for the rejection was that the claims at issue did not "qualif[y] as civil or commercial matters within the meaning of the [Hague Service] Convention," but the letter also noted that the "Krefeld Art Museum is not a separate legal entity, but is the property of the City of Krefeld."  ECF No. 15-2, at 9-10 (alterations in original) (first quoting ECF No. 15-4, at 8; then quoting ECF No. 15-4, at 2).  Ultimately, the Trustees effectuated service by letter rogatory pursuant to 28 U.S.C. § 1608(b)(3)(A), ECF No. 19, at 8, and the Kunstmuseen acknowledged receipt of service, ECF No. 12, at 2.

The Kunstmuseen has moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), asserting immunity from suit under the FSIA.  ECF No. 15.  The Trustees filed an opposition, ECF No. 19, and the Kunstmuseen filed a reply, ECF No 20.  Alleging that the

Kunstmuseen raised two new arguments for the first time in its reply, the Trustees filed a motion requesting leave to file a surreply.  ECF No. 24.

## II.    LEGAL STANDARD

"In general, the FSIA provides that foreign sovereigns and their agencies cannot be haled into this Nation's courts at all, but the Act sets forth exceptions to that general immunity." *Republic of Hungary v. Simon*, 604 U.S. 115, 118 (2025).  The "plaintiff bears the initial burden to overcome" the presumption of immunity "by producing evidence that an exception applies," after which "the sovereign bears the ultimate burden of persuasion to show the exception does not apply." *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 696 (D.C. Cir. 2022) (quoting *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013)).

A district court evaluating a motion to dismiss for lack of jurisdiction under the FSIA must first consider the "nature of the state defendant's argument" to determine the applicable legal standard.  *de Csepel v. Republic of Hungary*, 752 F. Supp. 3d 147, 152 (D.D.C. 2024), *appeal filed*, No. 24-7148 (D.C. Cir. Oct. 7, 2024).  If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the plaintiff "must allege facts sufficient to raise a plausible inference" of federal jurisdiction under one of the FSIA's exceptions.  *Simon*, 604 U.S. at 126; *see Phx. Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) ("[T]he district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff.").  By contrast, if the defendant seeks to challenge the factual basis of the court's jurisdiction, then "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary" to the ruling.  *Phx. Consulting*, 216 F.3d at 40.  The court has "'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction,' but it must give the

plaintiff 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *Id.* (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179-80 (D.C. Cir. 1984)).

This case concerns the FSIA's expropriation exception, which provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . .
>
> > (3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States . . . .

28 U.S.C. § 1605(a)(3). "For the exception to apply, . . . the court must find that: (1) rights in property are at issue; (2) those rights were taken in violation of international law; and (3) a jurisdictional nexus exists between the expropriation and the United States." *Schubarth v. Federal Republic of Germany*, 891 F.3d 392, 398-99 (D.C. Cir. 2018) (quoting *Nemariam v. Federal Democratic Republic of Ethiopia*, 491 F.3d 470, 475 (D.C. Cir. 2007)). The third requirement differs depending on the identity of the property owner. If the property at issue is owned or operated by a "foreign state" itself, then the property must be "'present in the United States in connection with a commercial activity' that the foreign state 'carrie[s] on' in the United States." *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 110 F.4th 242, 250-51 (D.C. Cir. 2024) (alteration in original) (quoting *Simon v. Republic of Hungary*, 812 F.3d 127, 146 (D.C. Cir. 2016), *abrogated on other grounds by Federal Republic of Germany v. Philipp*, 592 U.S. 169 (2021)). But if the property is owned by "an agency or instrumentality" of the foreign state, then there is no requirement that the property be present in the United States, and the plaintiff need only show

that the "agency or instrumentality" that owns the property "is engaged in a commercial activity in the United States." *Id.* at 251 (quoting *Simon*, 812 F.3d at 146).

## III.    DISCUSSION

As to the first element of the FSIA's expropriation exception, both parties agree that this case involves rights in property. *See* ECF No. 15-2, at 10-23; ECF No. 19, at 11; ECF No. 20, at 6-24. As to the second, the Kunstmuseen argues that the property at issue was not "taken in violation of international law." ECF No. 15-2, at 2, 12-15. More specifically, it argues that such a "taking" requires a "quintessentially sovereign" act, whereas the alleged conversions in this case are the type that an ordinary private party could commit. ECF No. 23, at 8 (emphasis omitted). And as to the third element, the Kunstmuseen argues that even if there had been a taking, the Kunstmuseen's "core functions" are "governmental," so the Kunstmuseen qualifies as a "foreign state." *Id.* at 22 (citations omitted). In its view, because the Kunstmuseen is a "foreign state" rather than an "agency or instrumentality" of a foreign state, it is immune from suit under the FSIA because the contested artworks are not "'present in the United States.'" ECF No. 15-2, at 3 (quoting 28 U.S.C. § 1605(a)(3)).

The Trustees argue that they have satisfied both contested elements for asserting jurisdiction under Section 1605(a)(3). ECF No. 19, at 9-24. They first argue that the Kunstmuseen's conversions of the paintings constitute takings in violation of international law. *Id.* at 13. They also argue that the "'core functions'" of the Kunstmuseen are "commercial," such that the Kunstmuseen is more appropriately categorized as an "agency or instrumentality" of a foreign state under the FSIA, *id.* at 16-20 (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151-53 (D.C. Cir. 1994)), so the paintings do not need to be in the United States for the exception to apply, *see id.* at 16; 28 U.S.C. § 1605(a)(3).

The court agrees with the Trustees that the Kunstmuseen's "core functions"—museum operations—are commercial, such that the Kunstmuseen is best understood as an "agency or instrumentality" of Germany.  The Trustees thus successfully allege facts to satisfy the third element of the expropriation exception even though the paintings are not "present in the United States." 28 U.S.C. § 1605(a)(3).  But the non-governmental nature of the Kunstmuseen's conduct ultimately proves fatal to the Trustees' case because the second element of the expropriation exception is not satisfied.  That is, the court agrees with the Kunstmuseen that expropriation is fundamentally a governmental act, and the alleged misconduct at issue here—the sale or exchange of paintings that belonged to Mr. Mondrian, and the failure to return the paintings upon the Trustees' demands—sounds more like a private tort than a governmental taking.  So even taking the Trustees' allegations as true, the Kunstmuseen was not engaged in any "violations of the international law of expropriation" when it kept the paintings from Mr. Mondrian and his successors.  *See Philipp*, 592 U.S. at 187 (holding that the plaintiffs failed to satisfy the second element of the expropriation exception because the "international law of expropriation" excluded the type of domestic takings alleged).  Because the Trustees fail to allege any public act of expropriation as the exception requires, the court will grant the Kunstmuseen's motion to dismiss.

The Trustees also move for leave to file a surreply in opposition to the Kunstmuseen's motion to dismiss.  ECF No. 24.  They seek to respond to two new arguments raised in the Kunstmuseen's reply in support of its motion to dismiss.  ECF No. 24, at 2-3.  Because resolution of this procedural matter affects the court's review of the merits, the court will address the motion for leave to file a surreply first.  For the reasons explained below, the court will grant the Trustees' motion for leave to file a surreply.

### A.    Motion for Surreply

While surreplies are "generally disfavored," *Kifafi v. Hilton Hotels Ret. Plan*, 736 F. Supp. 2d 64, 69 (D.D.C. 2010), *aff'd*, 701 F.3d 718 (D.C. Cir. 2012), "[i]t is within the court's authority to grant leave to file a sur-reply when 'the party making the motion would [otherwise] be unable to contest matters presented to the court for the first time in the opposing party's reply,'" *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 657 F. Supp. 2d 104, 108 (D.D.C. 2009) (quoting *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001)), *aff'd*, 383 F. App'x 1 (D.C. Cir. 2010). "[A] surreply is not a vehicle for rehashing arguments that have already been raised and briefed by the parties." *Crummey v. Soc. Sec. Admin.*, 794 F. Supp. 2d 46, 63 (D.D.C. 2011), *aff'd*, No. 11-5231, 2012 WL 556317 (D.C. Cir. Feb. 6, 2012). For a surreply to be appropriate, the opposing party's reply must have raised "truly new" arguments. *THEC Int'l-Hamdard Cordova Grp.-Nazari Constr. Co., Ltd. Joint Venture v. Cohen Mohr, LLP*, 301 F. Supp. 3d 1, 6 (D.D.C. 2018) (quoting *U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 270, 277 (D.D.C. 2002)). The court also considers "whether the movant would be unduly prejudiced were leave to be granted." *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 85 (D.D.C. 2014) (quoting *Banner Health v. Sebelius*, 905 F. Supp. 2d 174, 187 (D.D.C. 2012)). Ultimately, "[t]he decision to grant or deny leave to file a sur-reply is committed to the sound discretion of the court." *Flynn v. Veazey Constr. Corp.*, 310 F. Supp. 2d 186, 189 (D.D.C. 2004).

In their motion for leave to file a surreply, the Trustees seek to respond to two arguments. First, according to the Trustees, the Kunstmuseen argued for the first time in its reply brief that an entity's actions can amount to a "taking" under 28 U.S.C. § 1605(a)(3) only if "'[a] private party in the market could not have done what the [foreign state] did.'" ECF No. 24, at 2 (emphases omitted) (quoting ECF No. 23, at 8). The Kunstmuseen counters that it did not raise a new

argument because it had previously argued that the expropriation exception "requires 'a public act[] of expropriation.'"  ECF No. 26, at 2-3 (emphases omitted) (quoting ECF No. 15-2, at 14).  The court agrees with the Trustees.  When the Kunstmuseen initially used that phrase—a public act of expropriation—it was making an entirely different argument, namely, that a foreign state's possession of property must derive directly from an affirmative taking rather than a failure to return.  *See* ECF No. 15-2, at 12-15.  In its reply, the Kunstmuseen makes the new argument that a plaintiff can *never* allege a "taking" where the defendant's action is one that a private party could take.  *See* ECF No. 23, at 7-11 (arguing that conversion cannot be a basis for the expropriation exception because private parties can engage in conversion).  The court thus concludes that it is appropriate to consider the Trustees' proposed response to the Kunstmuseen's new argument.

Second, the Trustees seek to respond to the Kunstmuseen's argument that the Nazi policies of systematic persecution and expropriation did not cause a taking in this case.  ECF No. 24, at 3; *see* ECF No. 23, at 6.  According to the Kunstmuseen, this argument is not "new" either.  Rather, the Kunstmuseen had argued in its motion to dismiss that there was no taking during the Nazi era because Mr. Mondrian had voluntarily entrusted the paintings to the museum years before the Nazi regime came to power, and then the paintings went undiscovered during the Nazi era.  ECF No. 15-2, at 12-13.  In the Kunstmuseen's view, its reply builds on this argument by taking the Trustees' opposition to "concede the Paintings at issue 'escaped Nazi hands'" and thus were not "taken."  ECF No. 23, at 12 (quoting ECF No. 19, at 6); *see* ECF No. 26, at 4-6.  The court agrees with the Kunstmuseen that this argument generally falls within the scope of issues presented in the motion to dismiss, but the court discerns no prejudice to the Kunstmuseen in considering the Trustees' surreply.  That is because the Kunstmuseen has used its opposition to the proposed surreply to respond to the merits of the Trustees' arguments in their proposed surreply.  *See* ECF

No. 26, at 4 n.1, 6-7; *see also United States v. All Assets Held at Bank Julius Baer & Co.*, 307 F.R.D. 249, 251 n.5 (D.D.C. 2014) (considering a surreply because there was "no prejudice" to the non-movants where they had "responded to the merits" of the movant's arguments and where the court "agreed" with the non-movants that the arguments in the surreply lacked merit). Here, the surreply would not prejudice the Kunstmuseen because it "does not introduce any new facts that would change the outcome" of the Kunstmuseen's motion to dismiss. *Tsai v. United States*, No. 23-CV-2392, 2025 WL 823891, at *4 (D.D.C. Mar. 14, 2025) (quoting *Amissah v. Gallaudet Univ.*, No. 19-CV-679, 2022 WL 4016592, at *7 (D.D.C. Sep. 2, 2022)). The court will accordingly exercise its discretion to grant the Trustees' motion for leave to file a surreply.

### B.    The FSIA's Expropriation Exception

#### 1.    Rights in Property

Plaintiffs seeking to invoke the FSIA's expropriation exception must make "a legally valid claim that a certain kind of right is at issue (*property* rights) and that the relevant property was taken in a certain way (in violation of international law)." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174 (2017). The Trustees and the Kunstmuseen do not dispute that there are "rights in property" at issue here. *See* ECF No. 15-2, at 12-15; ECF No. 19, at 11. Courts routinely recognize paintings like the Mondrian Four and the Additional Mondrians as a type of property contemplated by the FSIA. *See Simon*, 604 U.S. at 128 ("The plain text of the expropriation exception treats all 'property' alike, whether that property is tangible (like a piece of art) or fungible (like cash)."); *see, e.g.*, *de Csepel*, 752 F. Supp. 3d at 157-58 (a sculpture); *Berg v. Kingdom of Netherlands*, 24 F.4th 987, 990 n.2, 992 (4th Cir. 2022) (143 paintings and other artwork); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951, 978 (9th Cir. 2017) (German painting).

## 2.    Taken in Violation of International Law

To establish jurisdiction over the Trustees' claims, the court must also determine whether the paintings at issue in this case—the Mondrian Four and the Additional Mondrians—were "taken in violation of international law." 28 U.S.C. § 1605(a)(3). The Trustees argue that two different "takings" could suffice to establish jurisdiction: (1) the Nazis' persecution in the 1930s, which required Mr. Mondrian to flee and prevented him from retrieving the paintings, ECF No. 24-2, at 6-7; and (2) the Kunstmuseen's subsequent conversions of the Paintings, including the sale or exchange of the Additional Mondrians in violation of laws imposed by the post-War Allies in the 1950s, and the refusal to return the Mondrian Four upon the Trustees' demands in 2018, ECF No. 19, at 11-15; ECF No. 24-2, at 7-11. The Kunstmuseen counters that neither satisfies the expropriation exception's requirement. ECF No. 23, at 5-14. The court agrees with the Kunstmuseen that the Trustees fail to allege a taking in violation of international law because the FSIA requires a public act of expropriation.

*a.    Mr. Mondrian's voluntary entrustment of the paintings and flight from Nazi persecution*

The Trustees first argue that a "taking" occurred in the 1930s because Nazi persecution "prevented [Mr. Mondrian] from retrieving these works; as a result, they were lost to him." ECF No. 24-2, at 6-7. The Kunstmuseen responds that its possession of the paintings stems from Mr. Mondrian's voluntary entrustment of the paintings to the museum, not due to any confiscation by the museum. ECF No. 23, at 6. The Kunstmuseen has the better of the argument.

First, recall the sequence of events resulting in Mr. Mondrian's loss of the paintings. Mr. Mondrian—through an intermediary or intermediaries—entrusted the paintings to the Kunstmuseen for inclusion in a planned exhibition in 1929. ECF No. 1 ¶¶ 35-36. The exhibition never occurred, but Mr. Mondrian did not seek return of the paintings, nor did the museum attempt

to return them.  *Id.* ¶¶ 37-38.  Nearly a decade later, after the Nazi Party had consolidated control of Germany, it began a "purge" of modern art and artists that it deemed "denegerate."  *Id.* ¶ 45.  The Nazis labeled Mr. Mondrian as a "degenerate artist" and included other works of his in an exhibit titled "Degenerate Art."  *Id.* ¶¶ 46-48.  Due to his fear of being targeted by the Nazis, Mr. Mondrian fled to the United States.  *Id*. ¶¶ 48-51.  Mr. Mondrian concluded that his paintings left in Germany were irretrievable, and he died just a few years later.  *Id.* ¶¶ 51-53.

Next, consider what it means for property to be "taken in violation of international law."  While the FSIA does not precisely define what it means for property to be "taken in violation of international law," "[t]hose familiar with constitutional or international law should have a strong sense of the meaning of that phrase: improperly confiscated by a government."  *Rodriguez v. Pan Am. Health Org.*, 502 F. Supp. 3d 200, 221 (D.D.C. 2020) (emphasis omitted) (citing *Taking*, Black's Law Dictionary (11th ed. 2019)), *aff'd*, 29 F.4th 706 (D.C. Cir. 2022).  The Supreme Court has accordingly instructed courts to look to the international law of expropriation to decide whether this requirement for jurisdiction has been met.  *See Philipp*, 592 U.S. at 180.  The international law of expropriation provides that "[a] state is responsible under international law for injury resulting from . . . a taking by the state of the property of a national of another state that (a) is not for a public purpose, or (b) is discriminatory, or (c) is not accompanied by provision for just compensation."  Restatement (Third) of the Foreign Relations Law of the United States § 712 (Am. L. Inst. 1987).  And the plain meaning of "expropriation"—"[a] governmental taking or modification of an individual's property rights, esp. by eminent domain"—accords with this definition.  *Expropriation*, Black's Law Dictionary (12th ed. 2024).  Finally, the FSIA's legislative history reveals that the House of Representatives contemplated a similar definition: "the nationalization or expropriation of property without payment of the prompt[,] adequate and

effective compensation required by international law." H.R. Rep. No. 94-1487, at 19-20 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6605, 6618. These definitions reveal two common requirements: (1) a public act, and (2) a taking or confiscation that causes another to be deprived of his property. Here, no such taking or confiscation occurred during the Nazi era because the paintings, having been entrusted to the Kunstmuseen, went untouched and thus unaffected by the Nazi's atrocious policies of expropriation.

The Trustees do not dispute that Mr. Mondrian voluntarily parted with the paintings when he caused them to be entrusted to the Kunstmuseen years before the Nazi Party rose to power. They also do not allege that Mr. Mondrian ever requested the return of his paintings, nor do they suggest that the Nazis stole, converted, destroyed, or otherwise directly deprived Mr. Mondrian of the paintings. Indeed, the Trustees expressly state that the paintings "escaped Nazi hands," ECF No. 1 ¶ 5, and that "the Nazis installed in Defendant's museum were apparently unaware of the location of the Paintings so they were not specifically removed from the museum as was done with other works," ECF No. 24-2, at 6; *see* ECF No. 1 ¶¶ 44, 46. Instead, the Trustees allege that the Nazi Party's "systematic expropriation and related persecution" of Mr. Mondrian prevented him from seeking the return of the paintings, thus causing them to be taken in violation of international law. ECF No. 24-2, at 7. The court recognizes that the Nazi Party engaged in many atrocities, including the expropriation of art, and that Mr. Mondrian may well have declined to seek the return of the paintings due to his fear of Nazi persecution (although he notably did not seek the return of the paintings in the eight years they sat at the Kunstmuseen before the Nazi Party consolidated power, *see generally* ECF No. 1). But it is difficult to see how the Nazi Party could have "taken" these particular paintings without engaging in any affirmative action with respect to them or

17

apparently even having knowledge of their existence. This is particularly so when Mr. Mondrian parted with the paintings on his own accord and never sought their return.

The Trustees cite two cases in support of their broad theory of a "taking," but neither is availing. First, they cite *Philipp* for the proposition that "[c]laims concerning Nazi-era art takings could be brought under the expropriation exception." ECF No. 24-2, at 6-7 (quoting *Philipp*, 592 U.S. at 185). This is true, but it requires that a plaintiff actually allege "Nazi-era art takings." They also cite *Republic of Austria v. Altmann*, 541 U.S. 677, 680-82 (2004), which involves, in the Trustees' own words, a "wartime taking" of art. ECF No. 24-2, at 7. But the Trustees make no allegation of a "wartime taking" of art here because, as explained, they allege no "taking" at all. Rather, they admit that Mr. Mondrian caused the paintings to be delivered to the museum years before the Nazi Party consolidated power. ECF No. 1 ¶¶ 35-36; ECF No. 19, at 11. In the absence of any alleged governmental taking, the court concludes that the Trustees have failed to establish that the paintings were "taken in violation of international law" during the Nazi era.

b.   *The 1950s sale or exchange of the Additional Mondrians and the 2018 refusal to return the Mondrian Four*

The Trustees next allege that if the paintings were not "taken" during the Nazi era, then the Additional Mondrians were "taken" in the 1950s and the Mondrian Four were "taken" in 2018. ECF No. 19, at 11-15. On the Trustees' telling, the post-war Kunstmuseen director knew that the Additional Mondrians still belonged to Mr. Mondrian, yet the director sold or exchanged them between 1951 and 1953 without authorization and without providing compensation to Mr. Mondrian's estate. ECF No. 1 ¶¶ 58-62. The Trustees argue that this conduct constituted a taking because "Defendant *converted and appropriated* the Additional Mondrians for its own use." ECF No. 19, at 11. The Trustees make a similar argument concerning the Mondrian Four—that

the Kunstmuseen hid the paintings so that Mr. Mondrian's successors would not discover them, and it then refused to return them upon the Trustees' demand in 2018.  ECF No. 1 ¶¶ 68-71, 74-78, 80-85.  The Kunstmuseen's primary response is that neither of these alleged conversions falls within the FSIA's expropriation exception because they amount to garden-variety commercial torts, not public acts of expropriation.  ECF No. 23, at 7-11.  The court agrees.  Neither the 1950s sale or exchange of the Additional Mondrians nor the 2018 refusal to return the Mondrian Four to the Trustees falls within the expropriation exception because both resemble ordinary commercial transactions rather than sovereign governmental functions.

As explained, the FSIA defines "taken in violation of international law" by reference to the international law of expropriation.  *See supra* pp. 16-17; *see also Philipp*, 592 U.S. at 187.  The Kunstmuseen argues that "to qualify as an 'expropriation,' the foreign state's acts giving rise to the plaintiff's claims must be 'quintessentially sovereign'—that is, of a type in which a private party categorically 'could not' engage."  ECF No. 23, at 1-2 (emphases omitted).  In support, it cites a host of cases, both in and out of this Circuit, analyzing the applicability of the FSIA's commercial-activity exception to alleged acts of expropriation.  *Id.* at 14-18.  The court finds these cases persuasive evidence that an "expropriation" is distinct from an ordinary commercial tort and requires the government to act in its sovereign capacity.

First, in *Rong v. Liaoning Province Government*, 452 F.3d 883 (D.C. Cir. 2006), the D.C. Circuit analyzed whether a plaintiff alleging expropriation could establish jurisdiction under the FSIA's "commercial act" exception, which applies when a sovereign engages in commercial activity like a private entity would, *id.* at 887-88.  The Court held that a subsequent commercial transaction involving expropriated property could not "transform the initial expropriation into commercial activity."  *Id.* at 889.  Because the state defendant's transaction involving expropriated

property still "constituted a quintessentially sovereign act," that transaction did not give rise to jurisdiction under the commercial-transaction exception. *Id.* at 890. In a similar case, the Second Circuit described "expropriation" as including "acts 'against individual property' that are carried out 'on a wide scale and impersonally' and are 'commonly referred to as "nationalization."'" *Garb v. Republic of Poland*, 440 F.3d 579, 586 n.7 (2d Cir. 2006) (quoting F.V. García-Amador, Louis B. Sohn & R.R. Baxter, *Recent Codification of the Law of State Responsibility for Injuries to Aliens* 48 (1974)). And in an "act of state" doctrine case, *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066 (D.C. Cir. 2012), the D.C. Circuit defined a "typical expropriation" case as one "in which a foreign government acts in its sovereign capacity to take private property for a public purpose." *Id.* at 1074. The *McKesson* Court concluded that a corporate takeover effectuated by agents of the Iranian government could not "fairly be characterized as public or official acts of a sovereign government" because the government "did not pass a law, issue an edict or decree, or engage in formal governmental action explicitly taking [private] property for the benefit of the Iranian public." *Id.*

Here, the Trustees do not allege that the Kunstmuseen deprived them of the artwork for any particular "public purpose" (in contrast to the Nazi-era expropriation of art the Nazis deemed antithetical to their cultural mission). Rather, it appears that the Kunstmuseen sold or exchanged the Additional Mondrians in the marketplace, as a private museum would, and that it continues to exhibit the Mondrian Four, as a private museum would. *See* ECF No. 1 ¶¶ 61-62; 81. Even taking as true the Trustees' claims of conversion, breach of bailment obligations, replevin, and unjust enrichment, *see id.* ¶¶ 88-149, the Trustees do not adequately allege that a foreign state or its agent has "taken" the paintings "in violation of international law."

Courts in other circuits have reached similar conclusions.  In *Williams v. Nat'l Gallery of Art, London*, No. 16-CV-6978, 2017 WL 4221084, at *4 (S.D.N.Y. 2017), *aff'd sub nom.*, *Williams v. Nat'l Gallery, London*, 749 F. App'x 13 (2d Cir. 2018), the plaintiffs sought to establish that a state actor's refusal to return paintings satisfied the expropriation exception.  *Id.* at *4.  The court disagreed, concluding that "[t]o refuse to return property is not to get property into one's possession or control but, rather, having previously acquired control, to retain the property despite a request that it be transferred to another."  *Id.*  That is, the court held that the failure to return does not satisfy the basic definition of a taking for purposes of the FSIA.  *Id.*  The court confirmed its conclusion by looking to congressional intent, explaining that, "[b]ecause the interpretation for which Plaintiffs advocate would significantly expand the expropriation exception, it would undermine Congress's goal to minimize irritations in foreign relations arising out of litigation."  *Id.* at *5.

The Eleventh Circuit has similarly observed that "expropriation is a uniquely sovereign act, as opposed to a private act."  *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1228 (11th Cir. 2018).  In that case, the court observed that Venezuela "did not seize the items through its police or other sovereign powers," but rather, "like a private buyer could do," it negotiated for the purchase of the contested artifacts.  *Id.* at 1221.  "Nothing about this act is uniquely or peculiarly sovereign in nature," the court concluded; rather, such conduct "is the type of activity that private persons and corporations regularly engage in."  *Id.*; *see Agurcia v. Republica de Honduras*, No. 21-CV-13276, 2022 WL 2526591, at *4-5 (11th Cir. July 7, 2022) (per curiam) (holding that the plaintiffs failed to satisfy the expropriation exception because the alleged intrusion on their property interests was not attributable "to an exercise of Honduras's sovereign power").  So too here: because the Trustees fail to allege that the Kunstmuseen has engaged in any

21

"uniquely sovereign" act, *see Devengoechea*, 889 F.3d at 1228, they cannot claim that the paintings were "taken in violation of international law," 28 U.S.C. § 1605(a)(3).

### 3.    Commercial-Activity Nexus

The parties also dispute whether the Trustees have met the commercial-activity nexus requirement of the FSIA's expropriation exception.  Because the paintings are not located in the United States, the Trustees can satisfy this requirement only if the Kunstmuseen is an "agent or instrumentality" of a foreign state, not a foreign state itself.[4]  In light of the court's conclusion that the Trustees have failed to allege that the paintings were "taken in violation of international law," it is not strictly necessary for the court to address this requirement of the FSIA's expropriation exception.  But because the court's consideration of this requirement flows naturally from its conclusion above that the Kunstmuseen's core functions are commercial, not governmental, the court can easily decide that the Kunstmuseen is an "agency or instrumentality" of a foreign state rather than a foreign state itself.

To decide whether an entity is an "agency or instrumentality" of a foreign state or is itself a "foreign state" under the FSIA, courts in this Circuit employ a categorical test, asking "whether the core functions of the foreign entity are predominantly governmental or commercial." *Transaero, Inc.*, 30 F.3d at 151.  If the "core functions" are commercial, the entity will be treated as an agency or instrumentality of the foreign state.  *Id.*  The court adopted this "core functions"

---

[4] The Trustees had originally argued that the governing interpretation of Section 1605(a)(3) permits a plaintiff to satisfy this requirement with respect to a "foreign state" defendant even if the property at issue is not "present in the United States."  ECF No. 19, at 10 n.2.  But the D.C. Circuit has since "reiterate[d]" that "there is no jurisdiction over a claim against a foreign state under the FSIA's expropriation exception unless the expropriated property is located in the United States." *Agudas Chasidei Chabad of U.S.*, 110 F.4th at 252.

test because "the [FSIA] largely codifies the 'restrictive' theory of sovereign immunity, under which 'immunity is confined to suits involving the foreign sovereign's public acts[] and does not extend to cases arising out of a foreign state's strictly commercial acts.'" *Id.* (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 487 (1983)).

The Trustees argue, and the court agrees, that the Kunstmuseen's core functions center around museum operation and maintenance.  The Kunstmuseen has a "task classification plan," issued by the Mayor's Office, which charges it with tasks such as "[c]onducting of museum operations," "[c]ollection and exhibition" of art and historical objects, "appraisal and acquisition of museum objects," research and development, putting on exhibitions, and inventory maintenance.  ECF No. 15-10, at 6; *see* ECF No. 15-2, at 7.  These are routine museum operation tasks that private entities may also engage in.  Indeed, roughly half the museums in Germany are private entities.  ECF No. 19-1, at 7 ¶ 16.  What is more, a state statute contemplates "institutions sponsored by the state," "independent cultural workers," *and* "non-profit and private-sector cultural enterprises" as entities that fulfill the state and municipal responsibility to promote art and culture.  *Id*. at 6 ¶ 14 (emphases omitted) (citing ECF No. 19-3, at 5 (Culture Code § 2 ¶ 2)).  Not only are the Kunstmuseen's core functions the "type" that private entities can engage in, private entities routinely engage in these activities in Germany with the encouragement of the German government.  *See id.* at 6-7 ¶ 15 (citing ECF No. 19-6, at 3-4 (German VAT Act § 4 No. 20a (1979))) (permitting a private museum to acquire the same tax-exempt status as a public museum "if the competent state authority certifies that they fulfill the same cultural tasks" (emphasis omitted)).  The "core functions" of the Kunstmuseen, even as defined by state law, are commercial tasks.

The Kunstmuseen responds that it is "an integral part of the City of Krefeld's political structure" because it is "legally indistinguishable from the City itself." ECF No. 23, at 14-15. The Kunstmuseen points out that it is structured as an "administrative sub-unit of the City's Department of Culture" and responds to an elected official, that museum employees are considered City employees under local law, and that the City of Krefeld directly provides roughly 85% of its funding. *Id*. Further, the Kunstmuseen notes that it is not an independent legal entity and cannot contract in its own name, be party to a suit, or purchase its own property. *Id.*; *see* ECF No. 15-7 ¶¶ 18-20. But these arguments stray from the thrust of the core functions test. The D.C. Circuit has clearly instructed courts to focus on the substance of an entity's tasks, rather than its legal structure or government-labeled purposes. *See de Csepel v. Republic of Hungary*, 27 F.4th 736, 745 (D.C. Cir. 2022). For "if simply labelling [an agency's] activities as 'governmental' were sufficient under the core functions test, the test would be highly manipulable; any foreign sovereign wishing to insulate an agency or instrumentality from suit could simply declare that the entity's functions are 'government functions.'" *Id.*; *see Smith v. Overseas Korean Cultural Heritage Found.*, 279 F. Supp. 3d 293, 297 (D.D.C. 2018) ("Although the Defendant's interests and objectives may align with, or be directed by, a foreign state, I must look to the 'nature' of the act rather than its 'purpose.'"). And on the flip side, "any nation may well find it convenient (as does ours) to give powers of contract and litigation to entities that on any reasonable view must count as part of the state itself." *Transaero, Inc.*, 30 F.3d at 152.

Under a functional inquiry, entities "clearly fall on the governmental side" when their core functions include military operations and foreign affairs. *de Csepel*, 27 F.4th at 744 (internal quotation marks omitted); *see, e.g.*, *Transaero, Inc.*, 30 F.3d at 153 (concluding that Bolivia's Air Force was a foreign state); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234-35 (D.C. Cir.

2003) (concluding that Iran's Ministry of Foreign Affairs was a foreign state). On the other hand, courts have found that tasks including "the construction and operation of a museum and the reproduction and sale of books and manuscripts" are "commercial actions in which private parties regularly engage." *de Csepel*, 27 F.4th at 744; *see Agudas Chasidei Chabad of U.S. v. Russian Federation*, 729 F. Supp. 2d 141, 147-48 (D.D.C. 2010) (finding that defendants who reproduced, sold, and distributed books were engaged in primarily commercial activities). The most analogous case for this question is *Smith*. There, the entity—a South Korean cultural foundation—"was created through Presidential decree under a South Korean statute" with a "national purpose traditionally performed by a government" of developing and preserving culture. 279 F. Supp. 3d at 297. So too here: state and local law "dictate and regulate the Kunstmuseen's mission, operations, and management." ECF No. 15, at 22. And that "mission" includes "the promotion and preservation of cultural values, the promotion of education, popular, and professional training, as well as the promotion of science and research." *Id.* at 8 (quoting Seeber Decl. ¶ 23). But in *Smith*, because the entity's core function—"to build and operate a museum"—was "not an act that *only* a sovereign power can do," the court concluded that the cultural foundation was an "agency or instrumentality" of South Korea. *Id.* (emphasis added). The Kunstmuseen argues that *Smith* is distinguishable because it "involved [a] distinct entit[y] that [was] not part of the political structure of [its] respective parent state[]." ECF No. 23, at 18. But to place structure over function would run afoul of this Circuit's core functions inquiry.

Another case in this district reinforces the court's conclusion. In *Estate of Hartwick v. Islamic Republic of Iran*, No. 18-CV-1612, 2021 WL 6805391, at *4-8 (D.D.C. Oct. 1, 2021), the court concluded that both Iran's national oil company and its central bank were agencies or instrumentalities of Iran. With regard to the oil company, the court recognized that even though it

was "run through Iran's Ministry of Petroleum," "entirely owned by the government," and engaged in "quasi-governmental" functions such as serving in a "supervisory or regulatory capacity over the Iranian oil industry," its commercial functions—the production and sale of oil products—predominated. *Id.* at *5 (internal quotation marks omitted). The court reached the same conclusion with regard to Iran's central bank, which was formed under federal enabling acts with the Islamic Republic of Iran as its sole shareholder. *Id.* at *6. While the central bank engaged in some "governmental" functions, including "note issuance within Iran," "setting credit allocation directives within the country," "implement[ing] monetary and credit policy directives" promulgated by a state council "of which the [b]ank's governor [wa]s also a member," and other regulatory activities including the monitoring of "nation-wide inflation and money supply targets," *id.* (internal quotation marks omitted), the court found that the bank also engaged in the "commercial" functions of a typical bank, including credit lending, payment of income taxes, and the operation of a "revenue-generating museum featuring Iranian artifacts," *id.* at *7 (internal quotation marks omitted). Despite the fact that the bank appeared closely intertwined with the Iranian government, the court concluded that its commercial "core functions" predominated and, accordingly, it was an "agency or instrumentality" of Iran. *Id.* This case is easy by comparison to *Estate of Hardwick*: the Kunstmuseen has no regulatory or policy-making functions, but rather is primarily engaged in the type of museum operations that the *Estate of Hartwick* court recognized as commercial.

Nevertheless, the Kunstmuseen urges the court to consider its embeddedness in the City of Krefeld's governmental structure as its overarching feature. ECF No. 23, at 15. In support of such an approach, the Kunstmuseen relies on two cases within this district, along with variants of the core functions test in other circuits. First, the Kunstmuseen argues that this case "closely

resembles" *Taylor v. Kingdom of Sweden*, No. 18-CV-1133, 2019 WL 3536599 (D.D.C. Aug. 2, 2019). ECF No. 23, at 22. In *Taylor*, the district court held that Sweden's National Museums of World Culture ("NMWC") was "'so closely bound up with the structure of the' Swedish sovereign that it [was] properly 'considered as the "foreign state" itself.'" 2019 WL 353659, at *3 (quoting *Transaero, Inc.*, 30 F.3d at 153). To be sure, the court in that case emphasized that the NMWC was a state agency obligated to carry out governmental functions. *Id.* But the court also emphasized that the NMWC's tasks included engaging in matters of "cultural diplomacy" and international affairs—tasks that courts in this district routinely recognize as uniquely governmental. *Id.* at *3-4; *see Roeder*, 333 F.3d at 234 (holding that Iran's Ministry of Foreign Affairs is a foreign state); *Howe v. Embassy of Italy*, 68 F. Supp. 3d 26, 33 (D.D.C. 2014) (collecting cases)). Here, there is no similar mission of international diplomacy. Instead, the Kunstmuseen is a collective of three municipal museums. And even if the *Taylor* court's conclusion turned on the legal structure of the entity at issue rather than its core functions, the D.C. Circuit subsequently clarified the primacy of the core functions test in *de Csepel*, 27 F.4th at 744-45.

Next, the Kunstmuseen points out that the district court in *de Csepel* held that a "state-owned company" was an "agency or instrumentality" based, in part, on the fact that it was "outside the hierarchy of the Hungarian government." ECF. No. 20, at 17 (quoting *de Csepel v. Republic of Hungary*, 613 F. Supp. 3d 255, 273 (D.D.C. 2020), *aff'd*, 27 F.4th 736 (D.C. Cir. 2022)). But on appeal, the D.C. Circuit eschewed any such analysis of the entity's public purpose or legal structure. *See de Csepel*, 27 F.4th at 743-45. Instead, the Circuit affirmed the district court's holding because the core function of the entity—"management of companies, movable property, and real property [was] overwhelmingly commercial." *Id.* at 745. Indeed, the court specifically

27

identified museum construction, operation, and the lending of art "between and among museums (both public and private)" as commercial functions. *Id.* (internal quotation marks omitted). Similarly, because the Kunstmuseen's core function—museum operations—is commercial, the court concludes that the Kunstmuseen is an agency or instrumentality of Germany rather than the foreign state itself.

Outside of this circuit, the Kunstmuseen points to cases that have endorsed treating an entity as a "foreign state" based on its structure. ECF No. 15-2, at 19 (citing *Berg*, 24 F.4th 987; and *Garb*, 440 F.3d 579). In *Berg*, the Fourth Circuit affirmed a district court's conclusion that a foreign state's "Ministry of Education, Culture & Science" and its "Cultural Heritage Agency" were part of the foreign state itself, not agencies or instrumentalities. 24 F.4th at 993-94. As the Fourth Circuit explained, the "core functions" of the ministry were "to set policy and regulate education, culture, and media" along with research and development. *Id.* at 993 (internal quotation marks omitted). The court concluded that "[p]lainly, on this record," the Ministry's core functions were "predominantly governmental." *Id.* at 993-94. It also noted that "structure informs function, and it was not improper for the district court to holistically assess evidence" that the ministry was structured as a political subdivision of the foreign state rather than as a "separate legal person." *Id.* at 995. And in *Garb*, the Second Circuit concluded that a foreign state's Ministry of Treasury was not an "agency or instrumentality" because it was legally structured as part of the state's government. 440 F.3d at 594-95. But both of these cases predated the D.C. Circuit's decision in *de Csepel*, and as explained above, the Court there reaffirmed that the "core functions" test asks only about the substance of the entity's functions, not about the legal composition or structure of the entity. This court is bound by the "core functions" test as enunciated by the D.C. Circuit, and

it accordingly concludes that because the Kunstmuseen's core functions are commercial, the Kunstmuseen is an "agency or instrumentality" regardless of its cultural mission or legal structure.

## IV.    CONCLUSION

For the foregoing reasons, the court will grant the Trustees' motion for leave to file a surreply, ECF No. 24, and grant the Kunstmuseen's motion to dismiss, ECF No. 15.   A contemporaneous order will issue.

LOREN L. ALIKHAN
United States District Judge

Date:    September 30, 2025